UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

Ron Casey Green,                          )
                                          )   Civil Action No.  5:20-cv-1301-KDW
                         Plaintiff,       )
                                          )
vs.                                       )
                                          )
                                          )                ORDER
Andrew M. Saul, Commissioner of           )
Social Security,                          )
                                          )
                        Defendant.        )

     This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").

Having carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision for the reasons discussed herein.

I.     Relevant Background

     A.     Procedural History

     On October 17, 2017,[1] Plaintiff filed an application for DIB alleging disability as of

September 23, 2016.[2] Tr. 168-69. Plaintiff's claim was denied initially, Tr. 68, and upon

reconsideration, Tr. 86, and Plaintiff requested a hearing, Tr. 101-03. On February 7, 2019, a

hearing was held before Administrative Law Judge ("ALJ") Edward T. Morriss and testimony was

taken from Plaintiff, who was represented by counsel, and from vocational expert ("VE") Dawn

---

[1] Although the Application Summary is dated October 24, 2017, as indicated in the Disability
Report and Transmittal, Tr. 68, Plaintiff's protected filing date is October 17, 2017.
[2] At the administrative hearing Plaintiff amended his alleged onset date to March 20, 2017, the
date of his surgery. Tr. 50.

Bergren. Tr. 34-55. On August 5, 2019 the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 15-26. Plaintiff requested review of the decision from the Appeals Council, Tr. 157. On February 7, 2020 the Appeals Council denied review, making the ALJ's decision the Commissioner's final decision for purposes of judicial review, Tr. 1-5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed April 6, 2020. ECF No. 1.

> B.    Plaintiff's Background

Born in April 1966, Plaintiff was one month shy of 51 years old as of his amended alleged onset date of March 20, 2017. Tr. 50, 188. In his initial Disability Report-Adult form Plaintiff noted that he completed the 12th grade, did not attend special education classes, and has not completed any specialized job training, trade, or vocational school. Tr. 193. Plaintiff listed his past relevant work ("PRW") as package delivery driver (2003-2016). *Id.* Plaintiff indicated that he stopped working on September 23, 2016 because of the following medical condition: injuries resulting from a car accident. Tr. 192. He indicated he is 5'11" tall, weighed 162 pounds, and his conditions caused him pain or other symptoms. *Id.*

A February 15, 2018 Disability Report-Appeal completed by Plaintiff's counsel indicated a change in Plaintiff's medical conditions. Tr. 216-17. The report indicated that "the most recent MRI says I have a bruise on my spine that causes me more pain. I have lots of limitations in mobility and balance with a lot of pain." Tr. 217. Plaintiff indicated a change in his daily activities due to his conditions and noted the following: "I have some days when I cannot get out of bed because of pain. I live alone & sometimes I cannot get up to make food or shower. I have therapy 3 times per week." Tr. 221.

In a subsequent Disability Report-Appeal dated May 17, 2018, Plaintiff indicated a change in his medical condition that occurred February 2018. Tr. 230. Plaintiff described the change as follows: "I have had injections in my neck and shoulder and my pain management doctor is suggesting a different injection. He says there is not [sic] other than pain management that he can do. I cannot sleep and I am more dependent on pain medication." *Id.*

C.    Administrative Proceedings

Plaintiff appeared with counsel in Charleston, South Carolina for his administrative hearing on February 7, 2019. Tr. 34. VE Bergren also appeared and testified. *Id.*

1.  Plaintiff's Testimony

In response to questions from the ALJ Plaintiff stated that he was 52 years old and completed the twelfth grade attending regular classes. Tr. 38.

In response to questions from his attorney, Plaintiff affirmed that he was 52 years old, and would be 53 in April. Tr. 40-41. Plaintiff indicated that he lived alone, but he had nearby family members who could help him if needed. Tr. 41. Counsel noted that Plaintiff worked from 2004 through 2009 at Alumax, and he asked Plaintiff to describe his job. *Id.* Plaintiff stated that he "was a pot servicer, and that consisted of changing out anodes out. It was like a two-man job." *Id.* Plaintiff stated that sometimes they would have to lift "up to 100, 150 pounds, 200 pounds" and this was on a 12-hour basis. *Id.* Plaintiff stated that this was considered "very heavy labor." *Id.* After Alumax, Plaintiff worked at DAK America from 2009 to 2012. Tr. 42. Plaintiff testified that he worked as a baler, and that job consisted of baling wool. *Id.* Plaintiff stated that he did not do any lifting, but he "would always have to do maneuvering, balancing them, pushing them, strapping them up for baling and for the forklift to get up under them." *Id.* Plaintiff indicated that job was considered "heavy manual labor" and the bales could weigh 500 to 700 pounds. *Id.*

3

Plaintiff testified that from 2013 until his wreck on September 23, 2016, he worked for Shaw Logistics as a contract delivery driver for FedEx. *Id.* Plaintiff testified that his job "consisted of going to a big warehouse, loading [his] van for delivery, and unloading it." Tr. 43. Plaintiff stated that he sometimes had to deliver office furniture, computers, or items weighing up to 200 pounds. *Id.* Plaintiff affirmed that he has not worked since his motor vehicle accident of September 23, 2016. *Id.*

Plaintiff confirmed that Dr. Steichen was his surgeon, and he has been treated by Dr. Keffer, who he last saw on January 8, 2019. Tr. 43. Plaintiff confirmed that updated MRIs were ordered and completed the previous Friday. *Id.* Plaintiff indicated that his medication was prescribed by Dr. Keffer, and he took his medication every day. Tr. 44. Plaintiff testified that he "kept going back to see Dr. Keffer because [he] was having trouble sitting, standing, and [he] was losing feeling in [his] right arm right down [his] right leg." *Id.* Plaintiff stated that he was told his surgery was not to make anything better, but was to prevent it from getting worse, and there was a chance that as he got older it would get worse. *Id.* Plaintiff stated that "it started getting worse real fast before [he] got older." *Id.* When asked to rate his neck pain, Plaintiff testified that if he made sudden turns or stepped down it felt like "metal to metal." Tr. 44-45. He stated that on a regular basis his neck pain rated at a seven on a ten-point scale. Tr. 45. He stated that his back pain was usually a seven, but some days it could be worse. *Id.* Plaintiff testified that on an average day he is usually up by 3:00 a.m. because he cannot lie down or sit down for long. *Id.* Plaintiff testified that he feels better "sitting up in a recliner." *Id.* Plaintiff confirmed that he is right-handed, and the pain is in his right arm. *Id.* Plaintiff testified that on some days he is unable to open a bottle of water and must use his mouth or left hand because he has no feeling in his right arm. *Id.* Plaintiff indicated that doctors thought that it was "nerves or related to nerves or [his] spinal cord." Tr. 46.

Plaintiff testified that he once was trying to walk a block for therapy and exercise and his right leg "gave out" and he had to be brought home in a police car. *Id.* Plaintiff confirmed that it caused him to fall and he could not make it home. *Id.*

Counsel noted that Dr. Keffer had placed Plaintiff on a 10-15-pound lifting restriction. Tr. 46. Plaintiff stated that his job did not offer him, or have, any light duty work. *Id.* When asked about side effects from his medications, Plaintiff stated that the doctor had to change his medication "a couple of times from the Gabapentin because one of them break[s] [him] out in a rash and one was making [him] feel nausea." Tr. 46-47. Plaintiff affirmed that his current medication makes him "very drowsy." Tr. 47. Plaintiff testified that he "feel[s] pain on it" and if he takes it on an empty stomach "it just ruins the whole day." *Id.* Plaintiff testified that he does not want to get "hooked on the pain medicine" so he takes Aleve daily. *Id.* Plaintiff testified that he reclines periodically throughout the day, going from his recliner to his couch. Tr. 48. Plaintiff testified that he was "down" between four and six hours a day depending on what time he took his medication. *Id.* Plaintiff stated he could sometimes sit for "about an hour, hour and a half. And then [he] start[s] getting this pain in [his] lower back, [and he has] to stand up or move around a little bit." Tr. 48-49. Plaintiff testified that he could stand 35 minutes to an hour, however sometimes his legs will buckle. Tr. 49. Plaintiff stated that if he attempted to work at a job where he could alternate sitting and standing he would have to stop every hour or hour-and-a-half to "stretch, sit down, move around, or find a different position." *Id.* Plaintiff testified that after an hour or hour-and-a-half he would be "down" for about an hour. *Id.* Plaintiff testified that on a typical day he reclines on his couch. *Id.* He stated that on some days he tries to get up and walk around outside for a few minutes. *Id.*

In response to questions from the ALJ, Plaintiff testified that he lived alone, and he did his own cooking that consisted of simple meals. Tr. 50. Plaintiff testified that he did his own laundry and was able to drive for short distances. Tr. 51. Plaintiff stated that he drove to the administrative hearing, and that drive took 45 minutes to an hour. Plaintiff confirmed that was "about the extent" of what he could do. *Id.* Plaintiff stated that on some days he did not have anyone to take him to the doctor, and he knew that he would not be able to take his medication. *Id.* Plaintiff testified that he was told the problem with his right arm was related to his neck injury and that it tore the nerves on his spinal cord. *Id.* Plaintiff testified that he has had injections in his shoulder, arm, and neck and doctors want to do it every three months. Tr. 52. Plaintiff stated that he was told it was not good to get the injections "too often because it could damage the bones or the tissues." *Id.*

### 2. VE's Testimony

The VE described Plaintiff's PRW as pot liner, Dictionary of Occupational Titles ("DOT") number 519.664-014, heavy exertion level, SVP of 4, semi-skilled; wool sacker, DOT number 920.687-198, medium exertion but performed as heavy, SVP of 2; sales route driver, DOT number 292.353-010, medium exertion but performed as heavy, SVP of 3. Tr. 53. The ALJ asked the VE to assume that Plaintiff is 52 years old, with a twelfth-grade education, and limited to light work with the following limitations: "He would be unable to climb ladders; would be limited to occasional overhead reaching with the bilateral upper extremities; and would need to avoid concentrations of cold." *Id.* The ALJ asked if there would be any available jobs he could perform and the VE testified that past work is eliminated, but he could perform other work described as follows: small parts assembler, DOT number 706.684-022, SVP:2, approximately 195,000 positions in the U.S.; cashier II, DOT number 211.462-010, SVP:2, approximately 1,269,000

positions in the U.S.; and shipping/receiving weigher, DOT number 222.387-074, SVP:2, approximately 71,000 positions in the U.S. Tr. 53-54.

The ALJ asked the VE to assume the same limitations as in the first hypothetical with the additional limitation that the individual "would require, on an unscheduled basis, work breaks, which would average two hours for each eight-hour day." Tr. 54. The VE indicated the individual would be unable to perform any of the identified jobs and it would also preclude other work. *Id.*

Plaintiff's counsel asked if the jobs identified in the first hypothetical would be available if the exertion level of light was changed to sedentary and the VE responded in the negative. Tr. 54. With no further questions, the hearing concluded. Tr. 54.

## II.     Discussion

### A.     The Commissioner's Findings

In his August 5, 2019 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
>
> 2.     The claimant has not engaged in substantial gainful activity since March 20, 2017, the amended alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3.     The claimant has the following severe impairments: degenerative disc disease of the cervical spine status post surgery and right trapezius strain (20 CFR 404.1520(c)).
>
> 4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he is unable to

climb ladders; can occasionally reach overhead with the bilateral upper extremities; and would need to avoid concentrations of cold.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 22, 1966 and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 20, 2017, through the date of this decision (20 CFR 404.1520(g)).

Tr. 20-21, 24-26.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.     Analysis

Plaintiff alleges the ALJ (1) failed to properly assess medical source opinion evidence, (2) failed to determine that Plaintiff meets Listing 1.04, and (3) erred in his evaluation of Plaintiff's subjective symptomology. Pl.'s Br. 12, 21, 23; ECF No. 13.

A.  ALJ's Consideration of Opinion Evidence

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. § 404.1520c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from [a claimant's] medical sources").[4] Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* § 404.1520c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c). This includes statements on issues reserved to the Commissioner such as whether a claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. § 404.1520b(c)(3).

    1.  James R. Keffer, D.O.[5]

Dr. Keffer examined Plaintiff on January 16, 2018 for complaints of neck pain that radiated into his right shoulder and back after his cervical spine surgery with Dr. Steichen. Tr. 542. Dr. Keffer's examination revealed no significant tenderness in Plaintiff's mid and lower lumbar

---

[4] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5).

[5] In addition to the opinions expressed below, after the ALJ rendered his decision Dr. Keffer provided a statement dated September 6, 2019, Tr. 12, that was submitted on September 17, 2019 to the Appeals Council, Tr. 9-10. The Appeals Council acknowledged receipt of the statement but found "this evidence does not show a reasonable probability that it would change the outcome of the decision" and did not exhibit the evidence. Tr. 2.

paraspinal region, and "some tenderness" in the thoracic paraspinals. Tr. 543. Dr. Keffer noted that Plaintiff's gait was normal, and he had 5/5 strength in his lower and upper extremities. *Id.* Dr. Keffer noted that Plaintiff was currently out of work, but that he "should be able to return to work in some capacity." Tr. 545. On January 23, 2018 Dr. Keffer completed a Work Restrictions Note indicating that Plaintiff was able to work with the restrictions of no lifting over 10-15 pounds occasionally, avoid overhead activity, no climbing ladders, and no operating forklift. Tr. 730.

Plaintiff underwent a spinal stenosis cervical EMG/NCS of his right upper extremity on February 8, 2018 that revealed normal cervical motion; tenderness over right upper trapezius; normal motion in the right shoulder, elbow, and wrist; motor testing at 5/5 throughout right upper extremity; and decreased sensation in right upper extremity dermatomes. Tr. 549. On February 20, 2018 Plaintiff returned to Dr. Keffer for an office visit and review of his EMG. Tr. 537. Upon examination Plaintiff again had normal gait and 5/5 motor strength. Tr. 538-39. He also had "tenderness in paraspinal muscles cervical and thoracic." Tr. 539. Dr. Keffer indicated Plaintiff's work status as "Light duty." Tr. 540. In his February 20, 2018 Work Restrictions Note, Dr. Keffer indicated the same restrictions as in his January 23, 2018 Note. Tr. 736.

Plaintiff returned to Dr. Keffer on March 23, 2018 complaining continued neck, shoulder, and back pain. Tr. 559. Dr. Keffer noted that Plaintiff was "done with physical therapy." *Id.* Upon examination Plaintiff had normal gait, 5/5 muscle strength, and continued tenderness in paraspinal muscles. Tr. 561. Dr. Keffer continued to note Plaintiff's work status as light duty and referred him to a pain management specialist. Tr. 563. Dr. Keffer completed another Work Restrictions Note on March 23, 2018, with the same restrictions as in his two prior Notes. Tr. 838.

Plaintiff received two trigger point injections from Dr. Keffer on April 9, 2018. Tr. 579-80. Plaintiff returned to Dr. Keffer on April 20, 2018 and indicated that the injections lasted two

days, but his neck pain resumed. Tr. 572. Plaintiff had normal gait and 5/5 motor strength on examination. Tr. 573-74. Plaintiff indicated a willingness to consider cervical epidural steroid injections to relieve his cervical thoracic region pain. Tr. 575. Dr. Keffer noted that Plaintiff was "out of work at this time." Tr. 576. Plaintiff returned on May 16, 2018 with the same complaints and the same examination results. Tr. 748-53. At his July 18, 2018 follow-up appointment, Plaintiff indicated that Workers Compensation denied the injections with the pain clinic. Tr. 755. Dr. Keffer again noted normal gait, 5/5 motor strength, and tenderness in Plaintiff's paraspinal muscles. Tr. 756-57. Dr. Keffer completed a Work Restrictions Note on July 18, 2018 indicating that Plaintiff was unable to return to work at that time. Tr. 739.

Plaintiff returned to Dr. Keffer for a follow-up appointment on November 2, 2018. Tr. 762. Plaintiff complained of neck and lower back pain, and weakness in his right knee. *Id.* Motor testing revealed 5/5 muscle strength and tenderness in paraspinal muscles. Tr. 765. Dr. Keffer noted that Plaintiff was out of work, but he revisited his discussion with Plaintiff regarding recommendations for other work options. Tr. 766.

On January 8, 2019 Plaintiff was seen by the Physician's Assistant ("PA") in Dr. Keffer's office. Tr. 780. He noted that Plaintiff had been the passenger in a car that was involved in a motor vehicle accident ("MVA") in November 2018. *Id.* Plaintiff indicated that his neck and back pain symptoms were worse, and he had just completed 12 chiropractor visits related to the MVA. *Id.* On examination Plaintiff had normal gait, 5/5 motor testing, and tenderness in paraspinal muscles. Tr. 781-82. The PA noted that Plaintiff was "out of work at this time." Tr. 784.

On February 6, 2019, Dr. Keffer provided a Medical Statement indicating that the restrictions he previously set in his March 20, 2018 Work Restrictions Note "would be continuing restrictions and would be permanent." Tr. 840. Dr. Keffer further indicated that he did not think

Plaintiff would be able to lift more than the 10-15 pound limit "at any time in the future." *Id.* On that same date Dr. Keffer completed a Physical Capacities Evaluation. Tr. 841-44. His diagnosis was chronic neck pain, status post multilevel cervical fusion, cervical myelopathy, right shoulder pain, thoracic back pain, and paresthesias. Tr. 841. He noted Plaintiff's prognosis was "Fair (chronic condition)," and identified his symptoms as neck pain, right shoulder pain, thoracic back pain, lower back pain, numbness and tingling of right hand, and right lumbar radiculitis. *Id.* Dr. Keffer indicated that Plaintiff's symptoms would be "frequently" severe enough to interfere with his attention and concentration to perform work-related tasks, and "possible" side effects from medication included increased sedation and drowsiness. *Id.* He noted that Plaintiff could sit or stand for 4-6 hours and walk for 2-3 hours. Tr. 842. He indicated that Plaintiff should "avoid overhead activity including reaching/handling" and noted that his upper extremity pushing/pulling was limited to 25-40% with weight restrictions. *Id.* He noted that Plaintiff could use both feet for repetitive movement. *Id.* Dr. Keffer indicated that Plaintiff could frequently lift or carry 0-5 pounds and occasionally lift or carry 5-15 pounds. Tr. 842-43. He indicated that Plaintiff could occasionally bend, squat, and reach above shoulder level, but could never crawl or climb. Tr. 843. He totally restricted Plaintiff from unprotected heights and heavy equipment, mildly restricted him from exposure to changes in temperature and humidity, moderately restricted him from driving automotive equipment (but noted that it "depends"), and had no restrictions from exposure to dust, fumes, and gases. *Id.* Dr. Keffer indicated that Plaintiff would need to take unscheduled breaks during an eight-hour workday due to increased symptoms of neck pain paresthesias, back pain, and sciatica. Tr. 843-44.

2. ALJ's Consideration of Dr. Keffer's Opinions

Recognizing Dr. Keffer's specialty as Plaintiff's treating neurologist, the ALJ considered the restrictions outlined in his January, February, and March 2018 Work Restrictions Notes, and in his accompanying treatment notes from February 2018 through January 2019. Tr. 24. The ALJ also considered Dr. Keffer's February 2019 Statement and the restrictions in his Physical Capacities Evaluation. *Id.*

The ALJ concluded that, overall, Dr. Keffer's opinions were only "partially consistent with the record as a whole." Tr. 24. He noted that Dr. Keffer's "April 2018 through January 2019 opinions indicating that the claimant was out of work appear to be based largely on the claimant's subjective complaints, as there are no objective clinical findings or medical imaging studies upon which to find that the claimant's functioning was more limited during those months." *Id.* The ALJ found that the evidence supported a limitation to a range of light work, and the "minimal weakness noted on examinations fails to show that the claimant would be incapable of lifting and carrying up to 20 pounds occasionally or that he would require unscheduled breaks or a sit/stand option." *Id.* Based on the residual effects of Plaintiff's cervical spine surgery and trapezius strain, the ALJ found the limitation to occasional overhead reaching was reasonable, but he found "no basis to prevent all overhead reaching." *Id.* The ALJ also found it "reasonable to restrict the claimant from climbing ladders to avoid injury due to findings of residual neck and shoulder pain." *Id.* Noting Plaintiff's admission of his ability to drive and his general denial of medication side effects, the ALJ did not include the restriction against operating heavy machinery. *Id.*

3. Discussion

Plaintiff contends the ALJ erred in finding Dr. Keffer's "out of work" notations were opinions that Plaintiff was incapable of working, and to conclude "that Dr. Keffer's 'opinion' was only partially consistent with the record as a whole is in error as Dr. Keffer did not opine [Plaintiff]

was totally unable to work as the ALJ suggests." Pl.'s Br. 17. Citing to physical therapy treatment notes, Plaintiff further argues that the ALJ erred because he failed to consider this evidence "that repeatedly document +3 out of 5 strength" in his upper extremities. *Id.* The Commissioner argues that the ALJ followed the revised regulations, assessed the persuasiveness of Dr. Keffer's opinion, explained how the factors of supportability and consistency were considered, and reasonably found his opinion only partially consistent with the record as a whole. Def.'s Br. 10.

Here, the ALJ explicitly applied the regulatory framework pursuant to Section 404.1520c to claims filed after March 27, 2017: "[a]s for medical opinion(s) and prior administrative medical finding(s), I will not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from your medical sources." Tr. 23. The ALJ properly applied the regulation which emphasizes the supportability and consistency factors when assessing the persuasiveness of the medical opinions. *See* 20 C.F.R. § 404.1520c. Moreover, as noted by the ALJ, an adjudicator is not bound to give any specific weight or deference to any medical provider's opinion, including those provided by treating sources. *Id.* When discussing the finding about the persuasiveness of an opinion, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ found the doctor's opinions only partially consistent with the record. The ALJ noted the lack of objective clinical findings and medical imaging studies to support more limited work restrictions during certain months and a lack of weakness on examinations that would support Dr. Keffer's lifting/carrying restrictions or need for unscheduled breaks. Tr. 24. As to Plaintiff's argument that the "out of work" opinion was not really an opinion that the ALJ should have considered, the court finds that the ALJ explained his reasoning adequately. The ALJ stated:

> In April 2018, May 2018, July 2018, November 2018, and January 2019, Dr. Keffer indicated that the claimant was out of work. However, physical examinations documented few, if any, additional clinical abnormalities beyond those noted when the claimant was found to be capable of performing a range of light work (Exhibits 15F, 23F, and 25F).

Tr. 24. The ALJ's consideration of the "out of work" statements demonstrates inconsistency with the medical evidence, regardless of whether it was considered an "opinion." Plaintiff's argument that the ALJ should have considered his physical therapy treatment notes does not require remand. The notes reflect that Plaintiff attended nine physical therapy sessions in February 2018 and was documented to have less than full motor strength in his upper extremities. Dr. Keffer's treatment notes document full motor strength in the months immediately preceding, during, and after Plaintiff's physical therapy treatment. The ALJ's failure to consider the physical therapy notes is harmless error. If the ALJ had considered the notes, they would further demonstrate a lack of consistency in Dr. Keffer's treatment notes with other evidence in the record. Furthermore, notes from one month of physical therapy compared to eight months of treatment with a treating neurologist do not overcome the ALJ's analysis. The ALJ's analysis comports with the new regulations as he properly considered the supportability and the consistency of Dr. Keffer's opinions.

Plaintiff also argues that the ALJ erred in finding the State agency physician opinions more persuasive than Dr. Keffer's opinions. Pl.'s Br. 20-21. In January and April of 2018 two State agency medical consultants, Dr. Stephen Worsham and Dr. Hurley W. Knott, provided physical residual functional capacity ("RFC") assessments of Plaintiff. *See* Tr. 61-64, 79-82. The doctors based their findings on MRIs, surgical notes, and treatment notes—including notes from Dr. Keffer and from physical therapy. The ALJ found their opinions to be "largely persuasive, as they are based on the consultants' medical expertise and they are well supported by the record as a whole."

Tr. 23. The ALJ found "no support for the restriction against exposure to unprotected heights, as treatment notes fail to document instability and the claimant has generally denied medication side effects" but he included the restriction against concentrations of cold "to avoid exacerbation of the claimant's pain complaints." Tr. 23-24. The ALJ provided an adequate explanation for how he found the opinions persuasive or not, and properly considered them and incorporated them into his RFC to the extent he found them supportive and consistent with the record.

Accordingly, the undersigned finds the ALJ's evaluation of the opinion evidence is in keeping with the revised regulations and is supported by substantial evidence.

B.  Listing 1.04

Plaintiff contends the ALJ did not fully analyze whether his impairment met Listing 1.04A. Pl.'s Br. 22-23. The Commissioner asserts that Plaintiff has not met his burden to prove that he meets the Listing and, "here there is no evidence of a nerve root compression as Listing 1.04A requires, as the ALJ found (Tr. 21)." Def.'s Br. 14.

 Listing 1.04 provides, in pertinent part:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic

nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04. A claimant's impairment "is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

The ALJ indicated that he "specifically considered whether the claimant's degenerative disc disease meets the requirements of listing 1.04." Tr. 21. The ALJ determined:

> [E]vidence of record fails to indicate that the claimant suffers from a disorder of the spine resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression with limitation of motion and sensory loss, spinal arachnoiditis manifested by severe burning or painful dysesthesia, or lumbar spinal stenosis resulting in pseudoclaudication and the inability to ambulate effectively.

*Id.*

In support of his argument for meeting Listing 1.04A Plaintiff cites to a post-surgical MRI finding made on November 7, 2017, that Plaintiff argues "demonstrated cord flattening at C3/4 and C4/5 as well as exit crowding and deflection [at] C6 and C7 (Tr. 509-510)." Pl.'s Br. 22. The findings from this MRI noted the following:

> Spinal cord: Normal signal and caliber. Several punctate and band-like foci of T2 and STIR hyperintensity in the midcervical cord compatible with myelomalacia related to prior compressive injury. No current cord compression or impingement. Remaining cord signal and caliber unremarkable.
>
> Craniocervical junction: Unremarkable central elements and junction as visualized.
>
> Findings by level:
>
> C2/3: Normal.
>
> C3/4: Mild disc bulge. Moderate uncovertebral and mild facet hypertrophy. Mild exit narrowing. Mild central narrowing. Mild anterior cord flattening.
>
> C4/5: This level is fused. Moderate uncovertebral and mild faced hypertrophy. Moderate exit crowding and deflection C5s. Mild central narrowing and anterior cord flattening.

> C5/6:  Moderate uncovertebral and mild facet hypertrophy. Mild exit crowding and deflection C6s.
>
> C6/7:  Moderate uncovertebral and facet hypertrophy. Moderate right and mild left exit stenosis. Crowding and deflection right C7.
>
> C7/T1:  Mild facet hypertrophy. No stenosis.

Tr. 509-10. The findings specifically indicate there was no cord compression, and any cord flattening was noted to be "mild." *Id.* For evidence of neuro-anatomic distribution of pain Plaintiff cites to various treatment notes of Dr. Keffer where he complained of neck and back pain and Dr. Keffer's Physical Capacities Evaluation noting his diagnosis and symptoms. Pl.'s Br. 22 (citing February 20, 2018 note, Tr. 537, 540; March 23, 2018 note, Tr. 559; April 20, 2018 note, Tr. 572; May 16, 2018 note, Tr. 748; and February 6, 2019 evaluation). Tellingly, as the Commissioner points out, Dr. Keffer reviewed the November 2017 MRI and in each of the treatment notes cited by Plaintiff, Dr. Keffer states regarding the MRI: "No very concerning findings noted." *See* Tr. 538, 560, 573, and 749. For limitation of motion of the spine Plaintiff cites to a January 25, 2018 one-time consultative examination. Pl's Br. 22 (citing Tr. 535). However, the consultant's notation reflected:

> The cervical spine is tender. Range of the neck is 30 degrees for flexion, 40 degrees for extension, 20 degrees for lateral flexion, and 60 degrees for rotation. There is thoracic spine tenderness. There is a no deformity of the lumbar spine. There is no limitation in range of motion of the lumbar spine. There is no tenderness of the lumbar spine.

Tr. 535. Plaintiff also cites to one of his physical therapy notes that indicates limited "pre-treatment" range of motion of his spine, Pl.'s Br. 22 (citing Tr. 788), and he cites to the remaining physical therapy notes to support his claim for motor loss, *Id.* (citing Tr. 788, 805, 810, 816, 819, 821, 824, 827, 830).[6] To support his claim for sensory loss Plaintiff cites to the results of the

---

[6] These are the same records discussed in the previous section of this Order that are contrary to Dr.

February 2018 EMG/NCS of his right upper extremity and a physical therapy notation. *Id.* (citing

Tr. 549, 802). The consultant who performed the EMG/NCS conducted a physical exam of

Plaintiff and reported the following:

> Cervical motion normal. Tender over right upper trapezius. Right shoulder, elbow
> and wrist have normal motion. Motor testing is graded is 5/5 throughout right upper
> extremity. Sensation is decreased and [sic] right upper extremity in all dermatomes.

Tr. 549. The physical therapy notation was from Plaintiff's subjective examination where Plaintiff

reported "numbness/tingling occasionally in bilateral arms." Tr. 802.

"For a claimant to show that his impairment matches a listing, it must meet all of the

specified medical criteria." *Sullivan v. Zebley*, 493 U.S. at 530. It is not enough that the claimant

has the diagnosis of a listed impairment; the claimant must also have the findings shown in the

listing of that impairment. 20 C.F.R. § 404.1525(d); *see Bowen v. Yuckert*, 482 U.S. at 146 and n.5

(noting the claimant has the burden of showing that his impairment is presumptively disabling at

step three of the sequential evaluation and that the Act requires him to furnish medical evidence

regarding his condition). The Commissioner compares the symptoms, signs, and laboratory

findings of the impairment, as shown in the medical evidence, with the medical criteria for the

listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in

severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A claimant

must establish that there was a "twelve-month period . . . during which *all* of the criteria in the

Listing of Impairments [were] met." *DeLorme v. Sullivan*, 924 F.2d 841, 847 (9th Cir. 1991)

(finding that the claimant's back impairment did not meet the requirements of section 1.05C;

remanded on other grounds) (emphasis added). While each symptom does not have to be present

simultaneously, the claimant must show that each of the symptoms are present and claimant has

---

Keffer's treatment records from the same period.

suffered or can be expected to suffer from them continuously for at least 12 months. *Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013). Here, Plaintiff has not made the requisite showing. No physician has diagnosed him with a Listing level impairment, and the evidence cited by Plaintiff does not demonstrate the required "evidence of nerve root compression with limitation of motion and sensory loss" for a 12-month period. Substantial evidence demonstrates that his impairments did not meet or equal Listing 1.04(A). Therefore, this allegation of error is without merit.

    C.  ALJ's Consideration of Plaintiff's Subjective Symptoms

    In his final argument, Plaintiff asserts the ALJ erred in his evaluation of Plaintiff's "subjective symptomology." Pl.'s Br. 23.  The Commissioner contends that the ALJ complied with the regulations in evaluating Plaintiff's subjective complaints. Def.'s Br. 14.

    A claimant's subjective allegations of pain or other symptoms alone can never establish disability. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1528(a), 404.1529(a); SSR 16-3p, 2016 WL 119029, at *2 (Mar. 16, 2016). Rather, the ALJ must consider "the extent to which [statements about subjective] symptoms can reasonably be accepted as consistent with objective medical evidence and other evidence" in the record. *Id*. The Fourth Circuit has established a two-step process for determining whether a claimant is disabled by pain or other symptoms. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, a claimant must provide objective medical evidence showing that a medical impairment exists, which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. § 404.1529(b); *Craig*, 76 F.3d at 594. If the claimant meets this threshold obligation, the ALJ then considers the intensity and persistence of the claimant's pain or other symptoms, and the extent to which it affects his ability to perform work-related activities. 20 C.F.R. § 404.1529(c); *Craig*, 76 F.3d at 595. The ALJ has the sole responsibility to weigh the

claimant's complaints against the record as a whole, and he may discount them when they are unsupported. *Craig*, 76 F.3d at 592-95.

In assessing Plaintiff's statements regarding his symptoms, under its scope of review, the court cannot make credibility determinations but may review the ALJ's decision to determine whether substantial evidence supports the ALJ's credibility assessment. *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005). This court is not tasked with the position of re-weighing evidence to make a new credibility determination. *See Hancock v. Astrue*, 667 F.3d 470, 471 (4th Cir. 2012) ("[i]n reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determination, or substitute our judgment for that of the [ALJ]") (citing *Johnson*, 434 F.3d at 653).

The ALJ outlined the two-step process that he is required to follow when considering Plaintiff's symptoms. Tr. 22. The ALJ discussed Plaintiff's hearing testimony regarding his neck, back, and leg pain, his issues with his right arm, and his activities of daily living and functional limitations. *Id.* The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* The ALJ then discussed the objective medical evidence of record. Tr. 22-23. *See* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work"). The ALJ noted that after his March 2017 surgery, Plaintiff followed up regularly with his neurosurgeon and although he "complained of persistent neck pain worse with turning his head, pain in his right

fingers, and decreased strength in his right hand, physical examinations were largely unremarkable. Treatment records documented full range of motion, no tenderness, and no muscle spasms in the neck or back (Exhibits 9F and 11F)." Tr. 22. The ALJ also discussed inconsistencies in a January 2018 consultative examination:

> I note that the claimant's reports to Dr. Looti are inconsistent with each other, as driving for an hour would involve sitting for significantly more than 3 minutes at a time. Further, the claimant's alleged lifting, sitting, standing, and walking limitations are more severe than those indicated by his treating physician or supported by the clinical findings documented on physical examinations. For example, while the claimant alleges difficulty walking, the evidence consistently documents a normal gait.

Tr. 23.

Plaintiff again cites to his physical therapy records, the EMG/NCS report of his right upper extremity, and one of Dr. Keffer's treatment notes to support his argument. Pl.'s Br. 24. The court finds that Plaintiff's citation to selective evidence does not render the ALJ's decision unsupported by substantial evidence because the ALJ's decision reflects careful consideration of the medical evidence as a whole and the limitations that stem from Plaintiff's impairments. The ALJ adequately explained the reasons supporting his determination that Plaintiff's statements of disabling symptoms were not entirely consistent with the record evidence. Here, the ALJ followed the applicable regulations in considering and discounting some of Plaintiff's subjective complaints. Tr. 22-23. Plaintiff's disagreement with the ALJ's decision is no reason to overturn it. *Johnson v. Barnhart*, 434 F.3d at 653 (quoting *Craig*, 76 F.3d at 589). The court therefore finds that Plaintiff has failed to show that the ALJ's evaluation of Plaintiff's subjective complaints is unsupported by substantial evidence or controlled by an error of law.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to

determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

May 18, 2021                                          Kaymani D. West
Florence, South Carolina                             United States Magistrate Judge